## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

KURT VUKONICH,

      Plaintiff,

      v.                                 No. CIV 12-1294 JB/CG

TOM HAVIL,[1]
Jail Administrator of San
Juan Detention Center,

      Defendant.

## **PROPOSED FINDINGS AND RECOMMENDED DISPOSITION**

**THIS MATTER** comes before the Court on Defendant's *Motion for Summary Judgment*, (Doc. 30), and Defendant's *Memorandum in Support of Motion for Summary Judgment*, (Doc. 31), filed November 12, 2013, collectively, "Motion for Summary Judgment"; Plaintiff's *Response to* Martinez *Report* ("Response"), filed December 19, 2013, (Doc. 32), construed as Plaintiff's response to Defendant's Motion for Summary Judgment; and *Defendant Tom Havel's Reply on Martinez Report* ("Reply"), filed January 2, 2014, (Doc. 33), and construed as Defendant's reply to Plaintiff's Response. The facts and allegations in Plaintiff's *Civil Rights Complaint Pursuant to 42 U.S.C. § 1983* ("Complaint"), filed December 12, 2012, (Doc. 1), are considered in the Court's analysis of Defendant's Motion for Summary Judgment, as is the evidence presented in Defendant's *Martinez Report*, filed November 11, 2013, (Doc. 28).

---

[1] Plaintiff filed his Complaint naming Tom Havil, but in Defendant's *Answer to Civil Rights Complaint Pursuant to 42 U.S.C. § 1983*, (Doc. 23), Defendant clarifies that his name is Havel.

## I.     Background

Plaintiff's claims relate to his incarceration at the San Juan County Detention Center ("SJCDC").  From August 7, 2010, until March 26, 2012, Plaintiff was in the custody of the SJCDC on seven different occasions, all of varying length.  (*See generally* Doc. 28 and Exhibits).[2]  From August 7, 2010 until August 20, 2010, Plaintiff was held in SJCDC on a breaking and entering charge (Cause No. D-2010-792).  (Ex. 3; Ex. 5).  He was arrested on August 29, 2010, on charges of aggravated battery against a household member and false imprisonment; he was released on September 9, 2010.  (Ex. 7; Ex. 9).  However, on September 10, 2010, Plaintiff was booked in the SJCDC because he violated his conditions of release on the breaking and entering charge.  (Ex. 10).  On October 20, 2010, Judge Hynes signed an order releasing Plaintiff under the supervision of Pretrial Services, but Plaintiff was not released from the SJCDC until October 26, 2010.  (Ex. 11; Ex. 12).

On March 26, 2011, Plaintiff was arrested for shoplifting, driving on a suspended license, and for failing to appear in court in connection with previous charges of driving on a suspended license.  (Ex. 15-17).  Two days later, on March 28, 2011, Plaintiff pleaded guilty to the shoplifting charges and received a ten-day jail sentence.  (Ex. 20).  Also on March 28, 2011, the SJCDC received, via fax, a notification to place a "No Bond Hold" on Plaintiff in connection with the breaking and entering charge (Cause No. D-2010-792).  (Ex. 19).

On April 26, 2011, Plaintiff was sentenced to 364 days in the SJCDC, with 200 days of the sentence suspended, in connection with the breaking and entering charge.

---

[2] Defendant filed 50 exhibits with the Martinez Report, (Doc. 28).  The Court refers to them by the Exhibit Number as outlined in the Index to Martinez Report. (Doc. 28 at 2-5).

(Ex. 23).  Pursuant to the judgment and sentence that was filed on May 10, 2011, Plaintiff was given sixty-one days of credit for pre-sentence confinement.  (Ex. 23).  An amended judgment and sentence was filed on June 7, 2011; according to this document, Plaintiff was given sixty-eight days of credit for pre-sentence confinement.  (Ex. 24).  In yet another amended judgment and sentence filed on June 27, 2011, Plaintiff received ninety-two days of credit for pre-sentence confinement.  (Ex. 25).  Plaintiff was released from SJCDC on June 28, 2011, after he posted bond on the charges brought in another case involving shoplifting (Cause No. M-2011-293).  (Ex. 21; Ex. 26-27).

Plaintiff was arrested on charges of criminal trespass and resisting/evading/ obstructing an officer on July 6, 2011, and released from the SJCDC on July 9, 2011, after posting bond.  (Ex. 29; Ex. 31).  He was again arrested on August 2, 2011, this time on charges of unlawful taking of a vehicle, tampering with the evidence, and larceny less than $250.  (Ex. 32; Ex. 34).  Plaintiff was released from the SJCDC on August 10, 2011, but after he failed to appear in court in several cases, he was arrested and booked in the SJCDC on September 2, 2011.  (Ex. 35; Ex. 37).  Plaintiff remained in the SJCDC until March 26, 2012, when he was committed to the custody of the New Mexico Department of Corrections.  (Ex. 40; Ex. 41).

On June 28, 2011, Plaintiff filed a grievance in which he complained that he was being held for more days than he was sentenced "because of a problem with timely and more importantly correct paper work."  (Ex. 28).  Plaintiff further stated that the courts were requesting paperwork but the SJCDC refused to accommodate him and that he had been unable to file anything, "including but not limited to [his] writ of habeus corpus

[sic]."  (Ex. 28).  Plaintiff did file a *pro se*[3] Petition for Writ of Habeas Corpus in the

Eleventh Judicial District Court in the State of New Mexico on November 28, 2011.  (Ex.

38).  Plaintiff filed another grievance on December 28, 2011, in which he stated:

> My habeaus [sic] petition is allowed by law.  Free process in post
> conviction proceedings is unnecessary given the undeniable access to the
> courts by persons indigent or not who seek to correct an unlawful
> confinement.  Why is it that you in particular acting under the colors of
> county continue to wilfully and deliberately deny me this right?

(Ex. 40).  Lt. Jim Calhoun responded to this grievance, explaining that Plaintiff's right to

file litigation was not being denied, but the facility had no obligation to provide him with

postage "at this point."  (Ex. 40).

On January 5, 2012, Plaintiff filed two additional grievances.  In one, he wrote

that Sgt. Mahia verbally denied him access to the law library.  (Doc. 32 at 26).  The

response indicates that the facility's policy is to grant an inmate use of the law library if

he is "*pro se* on the charges [he is] incarcerated for."  (Doc. 32 at 26).  The response

also states that Plaintiff is not *pro se* on the charges that he is "incarcerated for" and he

"will not be granted use to the law library."  (Doc. 32 at 26).  Plaintiff's second grievance

was directed to Defendant Havel, the jail administrator; Plaintiff complained that the

facility denied him access to the law library and postage for legal mail, and that he was

unable to file papers on his behalf.  (Ex. 39).  Plaintiff wrote that "San Juan County

Detention Center has fought me every step of the way when it came to mailing filing or

accessing legal issues. I have no choice but to give up my fight.  I am to [sic] stymied to

do anything."  (Ex. 39).  The response states only that "Lt. Calhoun spoke with you

about this issue."  (Ex. 39).

---

[3] Plaintiff was represented by court-appointed counsel for all of his criminal cases.  (*See generally* Doc. 28).

Plaintiff also filed two grievances in which he complained that he was forced to attend church services.  (Ex. 43; Ex. 50).  The church services were conducted in the common area of the open pod, and the television was turned off for the duration.  (Ex. 1; Ex. 2).  On June 12, 2011, Plaintiff objected to attending "mandatory church" and was placed in lockdown for three days pending a hearing.  (Ex. 46).  After his hearing, Plaintiff was released from lockdown.  (Ex. 47).  Plaintiff's second grievance was filed on December 11, 2011; he complained about the television being turned off and stated that "1 inmate attended services 4 were pissed off."  (Ex. 50).

Plaintiff's Complaint raises four civil rights claims pursuant to 42 U.S.C. § 1983: (1) Plaintiff was unlawfully confined for twenty-seven days because Defendant Havel, Christian Hatfield, and Robert Tedrow[4] failed to accurately calculate his pre-sentence credit, (Doc. 1 at 4); (2) Plaintiff was unlawfully confined for approximately six days after a judge signed an order for his release on October 20, 2010, (Doc. 1 at 4); (3) Plaintiff was denied access to the law library and was unable to file a petition for a writ of habeas corpus, (Doc. 1 at 6); and (4) Plaintiff's First Amendment right to religious freedom was violated, (Doc. 1 at 5).  Defendant filed a Martinez Report and also moved for summary judgment, alleging that Plaintiff cannot prove the necessary elements of his claims and that Defendant is entitled to qualified immunity.  (Docs. 30, 31).

## II.    Standard of Review

The court shall grant summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of

---

[4] United States District Judge James O. Browning dismissed the claims against Christian Hatfield and Robert Tedrow in the *Amended Memorandum Opinion and Order* filed on September 3, 2013. (Doc. 19).

the case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue is genuine if the evidence is such that a reasonable jury could resolve the issue in favor of the nonmoving party. *Id.* The movant bears the burden of making a prima facie demonstration that there is no genuine issue of material fact. *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670–71 (10th Cir.1998) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)).

If the moving party has demonstrated an absence of material fact, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587(1986) (internal quotations omitted). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson,* 477 U.S. at 249. The nonmovant must go beyond the allegations and denials of his pleadings and provide admissible evidence, which the Court views in the light most favorable to him. *Panis v. Mission Hills Bank, N.A.,* 60 F.3d 1486, 1490 (10th Cir.1995).

The purpose of a *Martinez* Report is to "develop a record sufficient to ascertain whether there are any factual or legal bases for the prisoner's claims." *Hall v. Bellmon,* 935 F.2d 1106, 1109 (10th Cir. 1991). "On summary judgment, a *Martinez* report is treated like an affidavit, and the court is not authorized to accept its fact findings if the prisoner has presented conflicting evidence." *Northington v. Jackson,* 973 F.2d 1518, 1521 (10th Cir.1992). A plaintiff's complaint may also be treated as an affidavit if it alleges facts based on the plaintiff's personal knowledge and is sworn under penalty of

perjury.  *Hall*, 935 F.2d at 1111.  A court may not rely on a *Martinez* report to resolve material disputed facts where it is in conflict with pleadings or affidavits, nor can material factual disputes be resolved based on conflicting affidavits. *Id.* at 1109, 1111.  A factual dispute exists even when the plaintiff's factual allegations in conflict with the *Martinez* Report are less specific or well-documented than the factual findings in the *Martinez* Report.  *Id.* at 1109.

The Court is mindful that it must construe the filings of a *pro se* litigant liberally. *See id. at* 1110. However, the Court should not be a *pro se* litigant's advocate.  *Id.*  In addition, Plaintiff, as a *pro se* litigant, must follow the same procedural rules that govern other litigants. *Nielson v. Price,* 17 F.3d 1276, 1277 (10th Cir.1994).

## III.    Analysis

### a.  § 1983

A civil rights action under § 1983 may be brought against a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State…, subjects, or causes to be subjected, any citizen of the United States. . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983 (1996).  To state a claim under § 1983, an injured person must allege a violation of a federally protected right, and must show that the alleged deprivation was committed by an individual acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988).

### b.  Unlawful Confinement Claims

#### 1.  Unlawful Confinement of 27 Days

In his Complaint, Plaintiff raises two claims of unlawful confinement.  (Doc. 1 at 4).  In his first claim, he argues that Defendant Havel was involved in miscalculating his

pre-sentence confinement credit, which resulted in Plaintiff serving "an unlawful 27 days

of confinement." (Doc. 1 at 4). Defendant maintains that SJCDC is not involved in

calculating the amount of pre-sentence confinement credit an individual receives, and in

any case, Plaintiff did not serve his full 164 day sentence, so there is no legal basis for

his claim of unlawful confinement. (Doc. 31 at 8-9).

Plaintiff's unlawful confinement claims are related to his sentence for breaking

and entering, which was 364 days, with 200 days suspended. The table below

identifies all of the dates that Plaintiff was incarcerated from August 7, 2010, the day

that he was arrested for breaking and entering, through June 28, 2011, when he was

released after serving his sentence for that charge.[5]

| Dates of Incarceration | Charges | Number of Days in the SJCDC |
|---|---|---|
| 8/7/2010 – 8/20/2010 | Breaking and Entering (Cause No. D-2010-792) | 14 |
| 8/28/2010 – 9/9/2010 | Aggravated Battery Against Household Member and False Imprisonment (Cause No. M-147-2010264) | 12 |
| 9/10/2010 – 10/26/2010 | Revocation of Conditions of Release (in Cause No.D- 2010-792) | 47 |
| 3/26/2011 – 6/28/2011 | Shoplifting (Cause No. M-2011-3205), Driving on Suspended License, Failure to Appear (in Cause No. TR-2010-12948), and No Bond Hold (in Cause. No. D-2010-792) | 95 |

Between August 7, 2010 and June 28, 2011, Plaintiff was incarcerated for a total

of 168 days. However, 12 of those days were for unrelated charges – aggravated

battery against a household member and false imprisonment. Therefore, in actuality,

Plaintiff served only 156 days of the 164 day sentence for the breaking and entering

---

[5] The number of days Plaintiff was incarcerated after June 28, 2011 is not relevant to his unlawful confinement claims.

charge.  Plaintiff has not provided any information on how he calculated that his unlawful confinement lasted 27 days.   In his Response, Plaintiff insists that he was incarcerated from August 7, 2010 through September 9, 2010, and that video and phone records from the SJCDC will substantiate this claim.  (Doc. 32 at 1-2).  However, Defendant submitted a criminal complaint and statement of probable cause that demonstrate that Plaintiff was arrested on August 28, 2010, after neighbors reported a domestic violence incident.  (Ex. 8).  This evidence completely undermines Plaintiff's contention that he was incarcerated during this time period.

Furthermore, Plaintiff has not provided any evidence to indicate that Defendant was involved in calculating the credit he received for his pre-sentence confinement, or was aware that Plaintiff's pre-sentence confinement credit meant that he should have been released earlier than he was actually released.  Three different judgment and sentencing orders were filed, each one indicating a different amount of credit for pre-sentence confinement.  Based on the first judgment and sentencing order, Plaintiff was to be released on July 7, 2011, while the second judgment and sentencing order indicated that his release date should be June 30, 2011.  Only with the final judgment and sentence, provided to the SJCDC on June 27, 2011, was Defendant on notice that Plaintiff's sentence was completed on June 5, 2011.  Plaintiff was released on June 28, 2011, demonstrating that he was released shortly after the SJCDC became aware that he had completed his sentence.

The Court agrees with Defendant that Plaintiff has confused the dates of his incarceration and possibly attributed time that he was serving in connection with the domestic violence charge to time that he was serving for the breaking and entering

charge.  As Plaintiff has failed to demonstrate that he was confined for longer than his sentence, his claim against Defendant Havel should be dismissed.

### 2.  Unlawful Confinement from October 20, 2010 – October 26, 2010

In his second claim for unlawful confinement, Plaintiff alleges that the SJCDC failed to release him on October 20, 2010, despite having an order from Judge Hynes that he was to be released.  (Doc. 1 at 4).  He argues that Pretrial Services approves all releases before the judge orders an inmate released to them and the jail changed the dates on the release order from Pretrial Services.  (Doc. 32 at 2).  Defendant maintains that when an inmate is ordered released to Pretrial Services, a copy of the order is sent to Pretrial Services, then Pretrial Services meets with the inmate to determine the date and time of release, and then another order is provided to the SJCDC.  (Doc. 31 at 10). He explains that the SJCDC did not receive the order from Pretrial Services until October 26, 2010, at which point Plaintiff was released.  (Doc. 33 at 3-4; Ex. 1; Ex. 2).

In this case, an Order releasing Plaintiff under the supervision of Pretrial Services was signed by Judge Hynes and apparently filed in the District Court of San Juan County on October 20, 2010.  (Ex. 11).  The record also contains Order Defendant Released to Pretrial Services, signed by Plaintiff on October 26, 2010.  (Ex 12).  On this second order, it is evident that someone changed the dates from October 20, 2010 to October 26, 2010, and initialled the change, though it is unclear who did so.  (Ex. 12).

Although Defendant argues that Plaintiff has not offered any evidence to support "his bare contention that Defendant Havel changed the dates," the dates on the order were obviously changed.  The Court agrees that there is no evidence in the record that Defendant Havel changed the dates, but there is also no evidence in the record

indicating who changed the dates, or supporting Defendant Havel's explanation of the release process.  When deciding whether to grant summary judgment, the Court must construe inferences in favor of Plaintiff, which in this case, suggests that someone changed Plaintiff's release date.

Without an explanation for the change in dates, or independent evidence of how the release process works, the Court is left with competing affidavits, an order with clearly modified dates, and almost no briefing on the law related to Plaintiff's claims.  At this juncture, the Court recommends that Defendant's Motion for Summary Judgment as to Plaintiff's second unlawful confinement claim be denied, and the record be developed further.

### c.  Legal Access Claim

In his third claim for relief, Plaintiff alleges that he was unable to file a petition for a writ of habeas corpus and, therefore, was denied access to the courts.  (Doc. 1 at 6; Doc. 32 at 3).  Plaintiff also alleges that he was denied access to the law library at a time when he was *pro se*.  (Doc. 1 at 6; Doc. 32 at 3).  Defendant responds that Plaintiff was represented by counsel in his criminal cases, which is an acceptable alternative to providing access to a law library.  (Doc. 31 at 10).

The "fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law."  *Bounds v. Smith*, 430 U.S. 817, 828 (1977).  An adequate law library is one constitutionally acceptable method to assure access to the courts, but it is

not the only way in which prisons may ensure meaningful access to the courts.  *See id.* at 830.

In this case, Defendant acknowledges that Plaintiff was not provided access to the law library, but insists that because Plaintiff was represented by an attorney in his criminal cases, there is no constitutional violation.  In support of this argument, Defendant cites *United States v. Taylor*, 183 F.3d 1199 (10th Cir. 1999), for the proposition that it is "well established that providing legal counsel is a constitutionally acceptable alternative to a prisoner's demand to access a law library."  (Doc. 33 at 5). In *Taylor*, a case involving an appeal of a criminal conviction, the defendant waived his right to counsel and represented himself at trial, but was appealing his conviction on the basis that his waiver was equivocal and based on his ability to access a law library and legal materials.  *Id.* at 1202-03.  The Tenth Circuit explained that access to a law library is only one way of ensuring meaningful access to the courts, and because defendant was provided with court-appointed counsel who stood by during his trial to assist him, his lack of access to a law library was not a constitutional violation.  *Id.* at 1204.

Plaintiff has argued that the state does not provide counsel for a habeas corpus petition, (Doc. 32 at 3), which makes this case distinguishable from *Taylor*, where an attorney was appointed, the defendant rejected the appointment, and the attorney remained accessible to defendant during his criminal trial.  The Tenth Circuit has recognized that an individual represented by an attorney in his criminal cases does not necessarily have constitutionally meaningful representation for other claims that he may want to file.  *See Love v. Summit County*, 776 F.2d 908, 910 (10th Cir. 1985). This recognition appears to conflict with the SJCDC's policy of allowing an inmate use of the

law library only if he is "*pro se* on the charges [he] is incarcerated for." (Doc. 32 at 26). Without additional factual information and legal argument, the Court is not persuaded by Defendant's argument that, because Plaintiff had representation in his criminal case, the SJCDC is absolved of the responsibility of providing access to the law library.

Defendant makes the point that Plaintiff was not denied meaningful access to the courts because he was able to file his habeas petition in November 2011. (Doc. 33 at 5). Defendant also noted that the petition was moot by the time it was filed, as Plaintiff had completed his sentence in June 2011. The Court presumes that Defendant makes this point to demonstrate that no harm resulted from the alleged denial of legal access, but this point only underscores the relevance of Plaintiff's June 28, 2011 grievance, in which he complained that he was unable to file legal paperwork during a time period in which his petition would not have been moot.

Defendant points to the pleadings in this case, the habeas petition, and pleadings in a pending state court action, arguing that "Plaintiff appears to be able to file as many court documents as he wants." (Doc. 33 at 5). The Court finds this misleading, as Plaintiff is no longer in the custody of the SJCDC and Plaintiff did not file his Complaint in this case until he was transferred to the custody of the New Mexico Corrections Department.

The Court recommends denying Defendant's Motion for Summary Judgment as to Plaintiff's legal access claim, as Plaintiff has raised a genuine issue of material fact as to whether he was unconstitutionally denied access to the law library, and other meaningful access to the courts.

*d. First Amendment Claim*

Plaintiff's fourth claim is that Defendant imposed Christian religious beliefs on inmates.  (Doc. 1 at 5).  In support of his contention, he states that he was forced to attend religious services twice each Sunday because they were held "in a room where there is no escape."  (Doc. 1 at 5; Doc. 32 at 3-4).  Plaintiff states that he objected to the services and, consequently, was placed in segregation for "not participating."  (Doc. 32 at 4).  Defendant counters that Plaintiff was not forced to attend religious services and his placement in segregation was because he disrupted the operations of the facility, not because of his refusal to participate in the services.  (Doc. 31 at 11; Doc. 33 at 6-7). The Court construes Plaintiff's claim as alleging that Defendant has violated the Establishment Clause of the First Amendment.

The Establishment Clause of the First Amendment forbids "excessive government entanglement with religion." *Lemon v. Kurtzman,* 403 U.S. 602, 613 (1971). At a minimum, the clause ensures that

> [n]either a state nor the Federal Government .... can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance.

*Everson v. Board of Education of Ewing Township,* 330 U.S. 1, 15–16 (1947).  This holding was emphasized in *Lee v. Weisman,* 505 U.S. 577, 587 (1992), when the Court wrote that "at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise."

Plaintiff's claim that Defendant imposed Christian religious beliefs is based on his characterization of the religious services as mandatory.  Defendant submitted two

affidavits, one from himself and one from Jim Calhoun, the Operations Lieutenant of the SJCDC, in which they attest that the services are voluntary, and inmates may go to their bunks or other areas of the pods during the service.  (Ex. 1; Ex. 2).  Additionally, in one grievance, Plaintiff stated that one inmate attended the service, while four were angry that the televisions had been turned off for the duration of the services, a statement that undermines his contention that the services are mandatory.  (Ex. 50).

However, there is also evidence that Plaintiff was placed in segregation after he asked not to attend the services, though Defendant argues that Plaintiff disrupted the operations of the facility and that is why he was placed in segregation.  The contemporaneous reports of the SJCDC staff indicate that Plaintiff asked that the religious volunteers be removed or that he be removed, but on the Lock Down Justification form, Plaintiff wrote that he "did not request lockdown, [he] requested to not have to attend mandatory church."  (Ex. 45).  There are no details as to how Plaintiff disrupted the operations of the facility, and it is unclear if his request that the volunteers be removed was in and of itself disruptive.   Essentially, the record contains contradicting statements from the parties about the circumstances of the religious services.

Defendant cites only one legal authority in support of his argument that there is no constitutional violation, *Priddy v. Garman*, 2012 WL 7151299 (W.D. Va. Mar. 14, 2012) *aff'd,* 474 F. App'x 968 (4th Cir. 2012).  In *Priddy*, a non-Muslim inmate complained about a group of Muslim inmates who conducted prayers in the common areas of the prison.  *Id.* at *2.  In concluding that there was no First Amendment violation, the court reasoned that the prison officials' willingness to allow the Muslim

inmates an opportunity to "conduct informal group prayers in the common areas is equally open to any inmate of any other religious persuasion.  Thus, this accommodation of Muslim inmates' beliefs does not constitute any improper endorsement of the Muslim faith over other religions."  *Id.* at *5-6.  The court also explained that allowing the prayers did not require other inmates to alter their leisure activities any more than they would to accommodate other inmates' non-religious activities in a limited space.  *Id.*

Importantly, this case does not involve an informal group prayer organized by inmates, but services conducted by outside volunteers who have gained entry to the SJCDC, presumably with the permission of Defendant.  Additionally, the record does not contain any information about other outside volunteers who are allowed to conduct religious services for other religions at the SJCDC.  Finally, the record is silent as to any comparison between the religious services and non-religious activities and their respective impacts on inmates' leisure activities.  Though *Priddy* may be persuasive authority, the Court does not have before it enough information to make such a determination at this time.

If Plaintiff's statements concerning the nature of the religious services and his placement in segregation are true,[6] it strongly suggests that there was an inability to escape the religious services, and as outlined above, the state cannot coerce an individual to attend a religious service.  *See Lee,* 505 U.S. at 587. Based on the evidence in the record, the Court finds that Defendant has not met his burden to

---

[6] In Plaintiff's Response, he also alleged that he was placed in segregation every weekend, but simply did not submit paperwork for the incidents.  (Doc. 32 at 4).  The Court does not credit this particular statement, as the record contains only one incident of Plaintiff being placed in segregation and Plaintiff's self-serving, conclusory statement that "the jail did paperwork for a while but eventually quit doing the paperwork" is not supported by any evidence.

demonstrate that there is no genuine issue of material fact, and summary judgment on this claim should be denied.

     *e.  Qualified Immunity*

     Defendant asserts the defense of qualified immunity, and argues that Plaintiff has not met his burden to show that Defendant's actions violated a clearly established constitutional right.  (Doc. 31 at 13).  He also argues, without citing to any authority, that "the fact that courts have recognized the constitutionality of the SJCDC's policies and treatment of the Plaintiff establishes that Defendant Havel is entitled to qualified immunity."  (Doc. 31 at 13).

     Based on the record, the Court finds that Plaintiff has raised genuine issues of material fact as to whether his constitutional rights were violated when he was not released from the SJCDC on October 20, 2010, when he was denied use of the law library, and allegedly forced to attend religious services.  The record contains no briefing as to whether these were clearly established rights.  While ultimately Defendant may be entitled to qualified immunity on these issues, on the basis of the record before the Court, it would be inappropriate to address the issue at this time.

## IV.    Conclusion

     For the reasons outlined above, the Court **RECOMMENDS** that Defendant's Motion for Summary Judgment, (Doc. 30), be **GRANTED IN PART** and **DENIED IN PART**.

     **IT IS THEREFORE RECOMMENDED** that:

    a. Defendant's Motion for Summary Judgment be **GRANTED** as to Plaintiff's claim that he was unlawfully confined for 27 days and that this claim be **DISMISSED WITH PREJUDICE**;

b. Defendant's Motion for Judgment be **DENIED** as to Plaintiff's claims that he was unlawfully confined from October 20, 2010 to October 26, 2010; he was denied meaningful access to the courts; and he was forced to attend religious services.

> **THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will b**

_____
THE HONORABLE CARMEN E. GARZA
UNITED STATES MAGISTRATE JUDGE